**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:25-CR-172 |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE BENITA Y. PEARSON |
| vs. | : | |
| | : | |
| ERNEST A. FULLER II, | : | |
| | : | **ERNEST FULLER'S** |
| Defendant. | : | **SENTENCING MEMORANDUM** |
| | : | |

Ernest Fuller submits the instant Sentencing Memorandum for the Court's consideration at his upcoming March 31, 2026, sentencing hearing and requests a sentence of 72 months, which is sufficient but not greater than necessary to achieve the statutory goals of sentencing.

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

/s/ *Justin J. Roberts*
JUSTIN J. ROBERTS
Assistant Federal Public Defender
Ohio Bar #0086168
1660 W. 2nd Street, Ste. 750
Cleveland, OH 44113
216-522-4856; fax 216-522-4321
Email: justin_roberts@fd.org

**MEMORANDUM**

A prison sentence of 72 months is sufficient but not greater than necessary in this case. Mr. Fuller [redacted], has experienced significant childhood abuse, survived severe bouts of depression, and has suffered from a long-term alcohol addiction. Despite the difficulties he has faced, Mr. Fuller has the potential to succeed and poses a low risk of recidivism. Mr. Fuller is amenable to mental health treatment, continued job training and furthering his education.

In fashioning a sentence, the Court is to impose the *lowest* sentence necessary to achieve the four statutory purposes of sentencing: justice; deterrence; incapacitation; and rehabilitation. 18 U.S.C. § 3553(a)(2); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). For the reasons detailed below and those which will be articulated orally at sentencing, a sentence of 72 months is sufficient but not greater than necessary to achieve those statutory goals. Mr. Fuller seeks a downward variance based on the § 3553(a) factors.

## I. The § 3553(a) factors support a 72-month sentence.

Based on a consideration of the § 3553(a) factors, a sentence of 72 months is sufficient but not greater than necessary to effectuate the goals of sentencing. Mr. Fuller's [redacted], his life circumstances, and the nature of the sentence warrant a sentence of 72 months.

[redacted]

[redacted]

[redacted]

> [redacted]

[redacted]

[redacted] As detailed in the following section, he experienced abuse and isolation, which caused him to develop depression and seek alcohol to manage his depression. [redacted]

[redacted] his experiences of isolation, his chronic depression, and his alcoholism all affected him in ways which led to committing the offense conduct.

**b. Mr. Fuller's life circumstances support a 72-month sentence.**

Mr. Fuller experienced an abusive childhood that caused him [redacted] and suffer from significant substance abuse.

Mr. Fuller was born in Toledo, Ohio in 1972. He grew up there until age 9, when the family moved to Temperance, Michigan. Mr. Fuller has a brother who is four years older than him, and he had a sister who had passed away before his birth. Mr. Fuller's father was not a positive role model. His father neglected him during his childhood, by physically and verbally abusing him. Mr. Fuller recalls five different occasions when his father beat him as a child. PSR ¶ 56. Mr. Fuller remembers his father calling him a "piece of shit" who would amount to nothing. Ex. A, at 5. When Mr. Fuller turned 14, his mother told him she was having an affair with a coworker. *Id.* at 4. This significantly affected Mr. Fuller's mental health, causing him emotional distress and depression. Mr. Fuller's older brother was also a negative role model, bullying him regularly and going so far as to lock Mr. Fuller out of the house on certain occasions. *Id.* at 6.

Significant research has shown that childhood abuse and neglect can cause reduced cognitive capabilities in early childhood that continue into adulthood.[1] Due to the lack of support from his family members, Mr. Fuller [redacted], and isolation throughout his childhood. Not only did these issues go unaddressed by his family, but they were caused by neglect as well.

Mr. Fuller struggled in school. [redacted] As a child, Mr. Fuller lacked peer relationships and felt like he was an outcast. [redacted] Academically, Mr. Fuller never improved past Cs and Ds in his grades, so he withdrew from high school in the 12th grade. [redacted] Despite his having difficulties with his academics and experiencing isolation in high school, Mr. Fuller met a young woman he believed he could spend his life with. She became his fiancé. She had promised to marry Mr. Fuller after she attended college in Florida. While she went to college, Mr. Fuller had dropped out of high school and remained in Temperance, Michigan. In 1995, a few years after high school, Mr. Fuller found out his fiancé had cheated on him at college. This devastated Mr. Fuller, causing him to attempt suicide with pills. He survived the attempt, though he became very ill. PSR ¶ 73, [redacted]

As Mr. Fuller grew older, [redacted]. What began as depression worsened into substance abuse and addiction, as he exhibited patterns that led to failed

---

[1] *See* Lane Strathearn et al., *Long-term Cognitive, Psychological, and Health Outcomes Associated With Child Abuse and Neglect. Pediatrics*, Pediatrics Vol. 146 Issue 4 (2020) (accessible at https://doi.org/10.1542/peds.2020-0438);
Ann Buchanan and J.E. Oliver, *Abuse and neglect as a cause of mental retardation: a study of 140 children admitted to subnormality hospitals in Wiltshire*, British Journal of Psychiatry, Vol. 131, Issue 5 (1977) (accessible at https://pubmed.ncbi.nlm.nih.gov/563265/);
Akemi Tomoda, *Preliminary evidence of neurobiological and behavioral consequences of exposure to childhood maltreatment on regional brain development*, Japanese Journal of Neurosurgery Vol. 32, Issue 6 (2023) (accessible at https://pubmed.ncbi.nlm.nih.gov/21941840/).

relationships and isolation. Mr. Fuller began abusing alcohol heavily at 22 years old. [redacted]. This addiction affected his relationships significantly, creating a cycle of depression and isolation.

After dropping out of high school, Mr. Fuller moved around several times over the years in his early 20s, until he settled down in Ottawa Lake, Michigan. PSR ¶ 57. There, he met his ex-partner, Pamela Brock. They developed a relationship that spanned many years, during which Ms. Brock gave birth to two children. PSR ¶ 61. Mr. Fuller raised his children with Ms. Brock, and they lived as a stable family.

In about 2008, Mr. Fuller and Ms. Brock had an argument. [redacted] Ms. Brock left abruptly, taking the children with her. They were 10 and 7 years old. This situation caused Mr. Fuller to spiral into severe depression and begin binge drinking every night. He began smoking cannabis every day. Ms. Brock and the children moved farther away, causing Mr. Fuller to lose access to the children entirely. This experience hurt Mr. Fuller so much that he attempted to kill himself. He slit his wrists and was taken to the hospital where he was treated for two days. [redacted] He was prescribed an antidepressant, but he could not afford the medication due to lacking insurance.

Soon after his second suicide attempt, Mr. Fuller moved from Michigan to Tennessee to live with a friend. [redacted] There, Mr. Fuller began working at Walmart. His friend also struggled with substance abuse, so they soon parted ways. Mr. Fuller found himself alone again and began drinking even more. Mr. Fuller continued living in this manner for the next six years, building his career at Walmart while coping with isolation by drinking alcohol.

In 2014, Mr. Fuller returned to Ohio, where he transferred to a Walmart in Strongsville. [redacted] He lived with his cousin for six months, until he met his current wife, Rebecca, at Walmart.

After two months of dating, they moved in together. Mrs. Fuller managed to convince Mr. Fuller to reduce his alcohol intake.

At first, Mr. Fuller and Mrs. Fuller had a happy relationship. Unfortunately, both parties struggled with deep-rooted mental and behavioral disorders. [redacted] Mr. Fuller suffered from alcoholism. These issues caused conflict in their relationship. Despite these challenges, they stayed together and had a son in 2015.

After his son was born, Mr. Fuller began having relationship issues again in about 2016. He was experiencing significant depression, as he attempted to cope with the difficulty of losing his past connections. He once again attempted to kill himself. He took multiple medications in an attempted overdose. [redacted] He became ill but, thankfully, survived the attempt.

As the years passed and Mr. Fuller continued building his life in Ohio, he continued to struggle with substance abuse and issues in his relationship. He became involved in domestic violence, which was fueled by his addiction to alcohol as he struggled to remain sober. While he engaged in substance abuse treatment with the Ed Keating Center and was prescribed depression medication there, he relapsed a few months after he came home. [redacted]

Despite his struggles, Mr. Fuller has the capability to be a productive and prosocial member of society. First, Mr. Fuller seeks to improve his behavior to have a healthier relationship with his wife. In 2025, he completed the 8-week Domestic Intervention Education and Training. While in custody during his current detention, he has completed anger management, domestic abuse, and substance abuse recovery courses. Ex. C, Transcript of Certificates at 1-5.

Second, Mr. Fuller has engaged in stable employment throughout his life, and he is driven to further his education. Mr. Fuller maintained a career at Walmart from about 2011 to 2017,

transferring his position from Tennessee to Ohio in 2014. After he was laid off from Walmart, he worked in different temporary jobs until he secured full-time employment in 2024 as a machine operator at All-Foils in Strongsville. Mr. Fuller would like to learn more trades while he is in the Bureau of Prisons. He seeks to attain his Commercial Driver's License and study Heating, Ventilation, and Air Conditioning (HVAC). PSR ¶ 85. While incarcerated, Mr. Fuller has already devoted his time to attaining education and job training. He has earned more than 67 certificates, including in courses such as Cognitive Awareness, Business Communication, and GED math, language arts, and social studies. Ex. C, Transcript of Certificates.

Third, Mr. Fuller seeks to improve his life so he can better provide for his son and wife. He is very close to his son, as they talk on the phone every day. [redacted]. When he was laid off from work, Mr. Fuller provided childcare for his son while his wife earned their household income. PSR ¶ 64. He helped his son with his homework, purchased groceries, and cooked meals for the family. Mr. Fuller is also supported by his wife, who knows him to be a caring father. [redacted]

Despite having a reduced intellectual level, Mr. Fuller survived experiences that caused him depression, isolation, and alcoholism. Despite the cycles of harm that threatened his life on multiple occasions, Mr. Fuller is still here. Mr. Fuller cannot be defined only by his bad conduct and [redacted], because he has also shown positive progress. He has work history, he is engaged in education, and he has cared for his son. He requests the Court see the good in him, credit him for the circumstances he has overcome, and give him the opportunity to improve his life by sentencing him to 72 months. He asks this Court include mental health and substance abuse programs in his sentence, so he can engage in long-term mental health treatment that can help him overcome the difficulties in his life.

**c. The remaining § 3553(a) factors support a 72-month sentence.**

After his term of incarceration, Mr. Fuller will be under supervision for at least five years, which will continue to ensure Mr. Fuller does not reoffend and that he continues attending whatever treatment the probation office determines is necessary. He will be required to register as a sex offender under SORNA. These additional conditions, in combination with six years in custody, are sufficient to achieve justice, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a)(2); *Kimbrough*, 552 U.S. at 101.

A sentence of 72 months in the Bureau of Prisons is a significant punishment for Mr. Fuller, who has never spent more than three months in jail. This amount of time is sufficient to disincentivize Mr. Fuller from engaging in his past criminal behavior. Given his work ability, his low criminal history category, and the need to provide for his family, Mr. Fuller poses a low risk of reoffending provided he undergoes mental health and substance abuse treatment. [redacted]. Further, as discussed in the following section, a downward variance for a 72-month sentence avoids unwarranted sentencing disparities. For all of these stated reasons and those which will be articulated orally at sentencing, a sentence of 72 months is sufficient but not greater than necessary under the § 3553(a) factors.

**II. A variance below the guidelines range is warranted because the guidelines range does not accurately reflect the seriousness of Mr. Fuller's conduct, nor fairly account for differing degrees of dangerousness.**

A variance below the advisory guideline range is warranted in this case. Mr. Fuller is subject to a 9-level increase in his offense level based on enhancements that both the Sentencing Commission and the Department of Justice agree do not "accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness" and apply

in almost every child pornography case. *See* DOJ Letter to Commission[2] and Sentencing Commission Report, p. 4.[3]

**a. The guideline enhancements always apply and therefore do not accurately reflect aggravating factors.**

Several sentencing enhancements apply in almost every child pornography case and therefore do not appropriately distinguish differing degrees of dangerousness. Specifically, the two-level enhancement under §2G2.2(b)(2) based on the material involving prepubescent minors (PSR ¶ 28); the two-level enhancement under §2G2.2(b)(6) for the use of a computer (PSR ¶ 31); and the five-level enhancement under §2G2.2(b)(7) for the number of images (PSR ¶ 32). Judge Zouhary has succinctly written on why each of these enhancements should not be applied. *See United States v. Hennessey*, 3:15-CR-131, Dkt. 25: Order Guidelines Range.

As to the enhancement for prepubescent minors: "Underage children are an inherent component of the underlying crime, and the fact that a defendant acquires images of prepubescent children in a collection should not be surprising." *Id*. at page 2-3. And this cannot be an aggravating factor because the enhancement applies to most child pornography cases. Similarly, that the defendant used a computer is not an aggravating factor. This enhancement is "like penalizing speeding, but then adding an extra penalty if a car is involved." *Id*. at page 3. Last, the number of images enhancement fails to "appreciate the ease with which an individual can accumulate images with today's digital technology." *Id*. at page 4. This enhancement applies to most cases. *Id*. *See*

[2] Available at https://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf

[3] United States Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offense*, June 2021, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf ("Sentencing Commission Report).

*also United States v. Jenkins*, 854 F.3d 181, 188 (2d Cir. 2017) (four of the §2G2.2 enhancements applied "'run-of-the-mill' and 'all but inherent to the crime of conviction'").

The Sentencing Commission first produced its Child Pornography Report to Congress in 2012[4] and "recommended that Congress enact legislation providing the Commission express authority to amend the guideline provisions that were promulgated pursuant to specific congressional directives." (Sentencing Commission Report, p. 2). The Department of Justice agreed "with the Report's conclusion that the existing Specific Offense Characteristics ("SOCs") in USSG § 2G2.2 may not accurately reflect the seriousness of an offender's conduct, nor fairly account for differing degrees of offender dangerousness." (DOJ Letter to Commission). The DOJ agreed guidelines revisions were needed. *Id*. Yet, "[t]o date, Congress has not implemented the Commission's statutory or guideline recommendations." (Sentencing Commission Report, p. 3).

The Sentencing Commission updated its Child Pornography Report in June 2021.[5] The report notes that "non-production child pornography offenses are unique because of the number of specific offense characteristics that apply to the vast majority of offenders sentenced under §2G2.2. The incidence of the underlying conduct and circumstances triggering sentencing enhancements has grown, particularly due to the evolution and prevalence of technology used to commit child pornography offenses. The 2012 *Child Pornography Report* explained that by fiscal year 2010, four of the six enhancements in §2G2.2(b)—together accounting for 13 offense levels—applied to the typical non-production child pornography offender and thus failed to meaningfully distinguish between more culpable and less culpable offenders." (Sentencing Commission Report, p. 18-19).

[4] Available at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses

[5] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf ("Sentencing Commission Report").

These enhancements continue to apply today in a clear majority of non-production child pornography cases. "Notably, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12). The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases." (Sentencing Commission Report, p. 19).

Guideline enhancements are "intended to increase the offense level based on the presence of an aggravating factor, but they routinely apply to the typical distribution, receipt, and possession offender, with minimal variation in application rate." (Sentencing Commission Report, p. 19). The Sentencing Commission has called on Congress to change the enhancements because "the sentencing enhancements in § 2G2.2 have not kept pace with technological advancements. (Sentencing Commission Report, p. 68).

> Facilitated by technology, child pornography offenses increasingly involve images in great quantities and of a graphic nature, often depicting the youngest of victims. These factors are already accounted for in §2G2.2 by a series of enhancements that were initially added to target more serious offenses and more culpable offenders. However, the conduct covered by four of the six enhancements—accounting for a combined 13 offense levels—has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2.

*Id*.

Because these enhancements no longer reflect an aggravating factor, courts have routinely varied below the guidelines range, finding the guidelines range is excessive and out of proportion to the offense. *See United States v. Walters*, 775 F.3d 778, 787-789 (J. Merritt, dissenting) (child pornography guideline sentence was excessive and out of proportion to the offense). Judges have criticized the "[d]isparate sentencing [that] is now the hallmark of sentencing decisions involving child pornography." *United States v. Warner*, 399 F. App'x 88, 96 (6th Cir. 2010) (J. Dowd,

dissenting) (listing examples of unwarranted sentencing disparities). The Sentencing Commission found that in fiscal year 2019, courts varied downward in almost 66% of child pornography distribution cases. (Sentencing Commission Report, p. 23).

The Sentencing Commission issues yearly reports on the use of all of the guidelines, tracking the use of specific offense characteristics. For U.S.S.G. § 2G2.2 in 2024, the Commission's Report revealed that 1366 sentences were imposed under § 2G2.2. Of the specific offense characteristics which were applied in those 1366 sentences the Report reflects that under § 2G2.2(b)(2), 1279 of the 1366 cases, or 93.6% applied the minor less than 12 years of age offense level increase: for § 2G2.2(b)(6) – the use of computer SOC, 1329 cases, or 97.3% applied this two-level offense increase; for the number of images under § 2G2.2(b)(7)(D), 1030, or 75.4% of the sentences imposed included the five-level increase under this SOC.[6] These raw data reports clearly show that these offense characteristics are not "specific" to a defendant, but are nearly automatic – in every case where § 2G2.2 is used. What this informs is the fact that the offense inherently includes these factors, and perhaps suggests that when these factors are **not** present, a downward variance would be better reflective of these "unique" characteristics, as opposed to increases which apply across the board.

The Sentencing Commission has tracked sentencing statistics for the past five fiscal years and can be sorted by primary sentencing guideline, total offense level, and criminal history category. The Judiciary Sentencing Information (JSIN), available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard. The statistics for similarly situated defendants (primary guidelines 2G2.2, offense level 34, and criminal history II) show district courts imposed

[6] See, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2024/Ch2_Individual_FY24.pdf (Pages 98 - 99).

a sentence below the advisory guidelines range in 64% of the cases. The average sentence imposed was 133 months and the median sentence was 121 months. (PSR ¶ 139).

The Supreme Court has held that a sentencing court has the power to sentence a defendant below the Sentencing Guidelines by declaring that applicable guidelines are excessive and unreasonable even in "mine-run cases." *Spears v. United States*, 555 U.S. 261 (2009). Following *Spears*, the Sixth Circuit has held district courts have the authority to vary from the sentencing guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *United States v. Camacho-Arellano*, 614 F.3d 244, 249 (6th Cir. 2010) (citing *Spears*, 555 U.S. at 264). While *Spears* concerned policy disagreements with the crack cocaine sentencing guidelines, the Sixth Circuit has held the authority to depart from the guideline range based on policy disagreement "is not limited to the crack cocaine context." *United States v. Herrera-Zuniga*, 571 F.3d 568, 584 (6th Cir. 2009).

The Sentencing Commission, DOJ, and courts have recognized the enhancements in § 2G2.2 have not kept up with the changes in technology and no longer target more serious offenses and more culpable offenders but instead apply in nearly every case. This has resulted in a downward variance in the majority of child pornography cases. Imposing a sentence within the guidelines range would be unreasonable and create an unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a). For these reasons, Mr. Fuller requests this Court impose a sentence below the advisory guidelines range.

## III. Conclusion

Ernest Fuller [redacted], experienced an abusive childhood, and suffers from severe depression and alcoholism. For the reasons above and those which will be

articulated orally at sentencing, Mr. Fuller respectfully requests the Court impose a sentence of 72 months. Such a sentence avoids unwarranted sentencing disparities and accounts for the mitigating factors in his case. This sentence is "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a).

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

/s/ *Justin J. Roberts*
JUSTIN J. ROBERTS
Assistant Federal Public Defender
Ohio Bar #0086168
1660 W. 2nd Street, Ste. 750
Cleveland, OH 44113
216-522-4856; fax 216-522-4321
Email: justin_roberts@fd.org